UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

00 OCT 19 PM 2: 07

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| DANNY McFARLIN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. |
| | ) | |
| v. | ) | 99-AR-2282-S |
| | ) | |
| CONSECO, INC., *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**ENTERED**

OCT 19 2000

## MEMORANDUM OPINION

The court has before it numerous motions, primarily relating to jurisdiction and venue. Plaintiffs, independent insurance agents, allege in their amended complaint that defendants unlawfully interfered with contracts and converted plaintiffs' customer bases. They claim breach of contract, tortious interference, unjust enrichment/restitution, fraud, and conspiracy. Six defendants, Conseco, Inc. ("Conseco"), Consolidated Marketing Group, Inc. ("CMG"), SunCoast Fringe Benefits, Inc. ("SunCoast"), Jim Hobbs ("Hobbs"), Mike Foster ("Foster"), and David King ("King"), have moved for dismissal for lack of personal jurisdiction.[1] CMG, SunCoast, Foster, and King have also made a

---

[1] Defendants Conseco Services, L.L.C. and Chris Weaver also had filed similar motions, but in their supplemental brief filed August 28, 2000, conceded this court's personal jurisdiction.

motion to dismiss for improper venue or alternatively a motion to transfer to the Northern District of Texas or the Southern District of Indiana. Conseco and Hobbs, as well as defendants Conseco Services, L.L.C. ("Conseco Services"), Conseco Health Insurance Company ("Conseco Health"), and Chris Weaver ("Weaver"), have filed a brief in support of the motion to dismiss for improper venue or to transfer venue to the Southern District of Indiana. Should this court not dismiss or transfer, CMG, SunCoast, Foster, and King move for a more definite statement. The tenth named defendant, Performance Matters Associates, Inc. ("PMA"), has not joined these skirmishes other than to raise venue as an affirmative defense in its answer to the amended complaint. It can learn from this opinion what its chances are in this court of prevailing at trial on its said affirmative defense.

## Findings of Fact

For the limited purpose of ruling on the motions currently pending before the court, the court finds the relevant facts to be these. Capitol American Life Insurance Company ("Capitol") marketed supplemental health insurance products through independent agents operating in several states, including Alabama. Around 1995

2

Capitol stopped selling insurance in Alabama.   In the spring of 1997, Capitol was purchased by Conseco, an Indiana financial services holding company with its principal place of business in Carmel, Indiana.  Around this time, Capitol became Conseco Health, a subsidiary of Conseco with its principal place of business in Carmel, Indiana.

Plaintiffs are or were independent insurance agents, first for Capitol, then for Conseco Health.  Plaintiffs sold insurance for Capitol/Conseco Health in Tennessee, Alabama, Missouri, Pennsylvania, Colorado, Illinois, North Carolina, and apparently Maryland, Virginia, Delaware, and Ohio.  They sought new customers and re-visited, or re-serviced, existing customers both at home and at work, where employee/customers were referred to as payroll or employer groups.  Of the 6 natural person plaintiffs, one each resides in Tennessee, Missouri, Pennsylvania, Colorado, Illinois, and North Carolina.  Of the 4 corporate plaintiffs, one each is incorporated and has as a principal place of business in Tennessee, Missouri, Colorado, and Illinois.

Weaver was employed by Capitol from June, 1988 to April, 1997, when it was purchased by Conseco.  He then became Executive Vice-President of Conseco Services.  At the time of the purchase, he was president of Capitol's business marketing division.  As a Capitol

3

employee, from 1991-1997, he visited Alabama at least 50 times to recruit marketing organizations. He may have also conducted sales meetings during these visits.

Hobbs was also employed by Capitol. He was regional vice-president from about November, 1994 to around May, 1997. His region did not include Alabama, and his responsibilities had no connection with Alabama. Subsequent to Conseco's purchase of Capitol, Hobbs became vice-president in the supplemental health marketing division of Conseco Services. He was the contact person for 4 marketing organizations, none of which operated in Alabama.

SunCoast was or is a Florida corporation. As a regional marketing organization, it operated in Alabama, South Carolina, North Carolina, and Florida. It acted as an independent contractor that sold Capitol insurance products and did sales support for other independent contractors. It did so in Alabama from 1992 to that point in 1995 when Capitol stopped selling insurance in Alabama.

Foster was president of SunCoast from 1992 to June, 1997, at which time he became CEO of CMG. From 1992-1995, for SunCoast, he visited Alabama approximately 30 times. The visits had two purposes: to sell Capitol insurance himself and to do sales support for other independent contractors. He was licensed to sell

4

insurance in Alabama from 1991 to around the time Capitol stopped selling insurance in Alabama.  He later re-acquired his license in association with a Birmingham-based company with no apparent connection to the present action.

King was vice-president of SunCoast from 1992 to June of 1997, at which time he became vice-president of CMG.  While with SunCoast, he visited Alabama between 1992 and 1995 about 12 times to recruit new independent contractors.  He was licensed to sell insurance in Alabama from 1991 to roughly the time Capitol stopped selling insurance in Alabama.

For some period of time while SunCoast was operating in Alabama, National Benefits of America, believed to be owned by Irvin Morris ("Morris"), marketed products for SunCoast and had an office in Birmingham, also known as "the Hoover office."

In 1995, Weaver, while president of Capitol's business marketing division, met with Foster and King, both representing SunCoast, in Birmingham.  All three men recall the subject matter of the meeting in broad terms: sales and marketing opportunities between SunCoast and Capitol.

In June, 1997, Foster and King formed and incorporated CMG. It had the same principals as SunCoast and operated out of the same offices as SunCoast.  Foster owned 51% of the stock; King, 49%.

Foster was CEO and King vice-president until it was acquired in June, 1999 in a move involving Weaver.

Contemporaneous with CMG's creation and approximately 2 years after Conseco's purchase of Capitol, a Conseco entity or entities instituted a consolidation move that put any independent agency that wrote less than $2 million in annual sales for Conseco Health under CMG's "hierarchy." At least one plaintiff was informed of the consolidation and CMG's role by a letter from Weaver on "Conseco Companies" letterhead. The consolidation made CMG a middle man: Conseco Health's sub-$2 million independent contractors reported to CMG, who then dealt with Conseco Health. In this way, CMG became a national marketing organization exclusively marketing Conseco Health products and providing sales support for independent contractors. CMG had agents serving roughly 40 states, but not Alabama.

Around the time of CMG's birth, King met with Morris in Birmingham to discuss Morris's opportunities with the soon-to-be- or newly- formed CMG. At or after this meeting, Morris decided, essentially, to abandon National Benefits, which was swept up in the consolidation and went on as an unused agency under CMG's hierarchy. He took a position with CMG and moved to CMG's only other office, the primary one in New Port Richey, Florida. So, in

6

June, 1997, CMG "inherited" National Benefits's Hoover office and began operations from there.   CMG did not purchase National benefits, and Morris received no remuneration other than residual income of National Benefits.

The CMG employees in the Hoover office contacted clients or potential clients, all outside Alabama, by telephone to schedule times for independent agents to meet with them.   The recipients/targets of these calls included clients/contacts of at least some of the plaintiffs. The office manager, Holly Whitt ("Whitt"), reported to a CMG employee in the New Port Richey office who was one or two steps down the chain of command from both Foster and King.

As CEO of CMG, Foster developed marketing strategies and oversaw normal business operations.   From the time of CMG's creation until the sale of its assets, Foster visited the Hoover office three times.   He has no recollection of conducting any business from that office on any of his visits.

As CMG's vice-president, King was responsible for recruiting and retaining independent agents.   He had little direct contact with the Hoover office; he spent a total of a few hours there. Like Foster, he apparently did not conduct any business during his time in the office.

7

In the course of conducting business for either SunCoast or CMG, or both, Foster had contact with payroll groups and/or individuals who were existing contacts or clients of plaintiffs. Foster's contact included meetings with customers in North Carolina, Illinois, and Tennessee.   There is no evidence that Foster made contact with these people from Alabama or met with them in Alabama.

Weaver left Conseco Services in June, 1998 to become president and CEO of TLC National Marketing ("TLC"), of which he owned 100% of the stock.   Hobbs left Conseco Services to become president of TLC in September, 1998.   TLC was incorporated in Delaware but apparently had its only office in Dallas.   It marketed supplemental health insurance to customers at work and home and did sales support for independent contractors with various Conseco companies. No contractors were located in Alabama.

In October or November of 1998, Weaver, at this time with TLC, and Foster, while CEO of CMG, met in Birmingham.   Weaver says they discussed TLC's acquisition of CMG assets.   Foster recalls that they talked about a laptop enrollment system and other items, the subject matter of which he doesn't remember.

The sale of CMG's assets was the subject of discussions from as early as late 1998 until the eventual sale on June 2, 1999.

8

Foster met with Weaver about the sale in Florida and in Carmel, Indiana and spoke with him over the phone from Florida. King had numerous phone conversations from Florida with Weaver. Before or after the sale, Foster also dealt with John Sharpe ("Sharpe"). Although Foster believes that Sharpe was president of Conseco Health during these discussions, Sharpe's business address as it appears in the contract for the sale gives a Conseco, Inc. address.

On June 2, 1999, TLC acquired CMG assets, as well as the assets of SunCoast and Southeast Benefits, Inc. (apparently another Foster-King entity), in an agreement signed in Clearwater, Florida. Of the roughly $21 million purchase price to be paid by TLC, $2 million went to Conseco and $16 million was payable to the sellers (Foster, King, SunCoast, and Southeast). The remaining $3 million was a "hold back payment" and was guaranteed by Conseco. In addition, the agreement required the consent of Conseco in regards to the sellers' performance on the agreement. Finally, if any documents or notices related to the agreement were to be sent to the purchaser, the agreement directed that they be sent to Sharpe at a Conseco, Inc. business address and to John Sabl, also at a Conseco, Inc. address. Foster states that he was remunerated by "Conseco somebody."

On June 3, 1999 Conseco issued a press release that stated

that the day before it had acquired CMG and TLC.  The release also announced plans to combine TLC, CMG and a soon-to-be-acquired third company to form a new wholly-owned subsidiary to be headed by Weaver, PMA.  Once PMA was formed, Weaver became its president and CEO, positions he still holds.  Hobbs became, and still is, COO of PMA.  In these positions, they are paid by Conseco Services.

The result of the events executed on June 2, 1999 was that PMA took over the day-to-day operations of the Hoover office.  In the approximately 60 days after the acquisition and before PMA closed the office, the Hoover office apparently continued on as it had before.  These employees were paid by Conseco Services during this period.  Hobbs was responsible for the Hoover office, but never visited it.  He spoke with Whitt at least weekly. When the office was closed, all records, except for those regarding specific clients that were needed by independent agents, were sent to New Port Richey.  When that office was closed, sometime before Thanksgiving, 1999, the records were sent to PMA headquarters in Dallas.

Conseco offers goods and services through its subsidiaries, some of which are currently active in Alabama.  This includes Conseco Health, which is licensed to sell insurance in Alabama. Conseco advertises in national publications and one emphasizing the

10

South, *Southern Living*.

Plaintiffs allege that at that beginning of these events, in the early 1990s, they each had a certain customer base.  By the end of these events, in the late 1990s, they claim that their customer bases were diminished.  They seek to hold defendants responsible for this diminishment and seek to prove that the way in which defendants converted their customer bases was unlawful.  More specifically, plaintiffs allege that first SunCoast was used to convert their customer bases, then the purchase of Capitol by Conseco and the CMG consolidation moves allowed CMG to be used to continue the illegal conversion of plaintiffs' customer bases.  The steps which led to CMG's assets being owned by Conseco are also alleged to have been undertaken as part of defendants' unlawful scheme.

## Application of the Law

### I. Defendants' Motions to Dismiss for Lack of Personal Jurisdiction

### A.  Discussion

A federal court sitting in diversity may exercise personal jurisdiction only over those defendants a state court in the same state in which the federal court is located could properly hale into its presence.  *See Madara v. Hall*, 916 F.2d 1510, 1514 (11th

11

Cir. 1990).  Thus, both the applicable state long-arm statute and
the Constitution of the United States restrain the reach of this
court in this action.   In Alabama, the state long-arm statute
extends as far as the Constitution allows.  *See* Ala. R. Civ. P.
4.2(a)(2)(I); *Ex parte Kamilewicz*, 700 So.2d 340, 341-42 (Ala.
1997).  Therefore, the two branches of analysis collapse into one.
*See Brown v. Astron Enterprises*, Inc., 989 F.Supp. 1399, 1404
(N.D.Ala. 1997); *Ex parte Kamilewicz*, 700 So.2d at 341-44 (Ala.
1997).

The Due Process Clause of the Fourteenth Amendment requires
that a defendant have sufficient "minimum contacts" with the forum
such that exercising personal jurisdiction over him would not
offend "'traditional notions of fair play and substantial
justice.'"   *International Shoe Co. v. Washington*, 326 U.S. 310,
316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (citations omitted).
Depending on the nature of a defendant's contacts, personal
jurisdiction can be established in one of two ways.  *See Burger
King v. Rudzewicz*, 471 U.S. 462, 472-73, 105 S.Ct. 2174, 2182, 85
L.Ed.2d 528 (1985).  Specific jurisdiction may be found if a
defendant availed himself of the benefits and protections of the
laws of the forum through purposefully made contact with the forum

and if the cause of action arise out of or relates to those contacts.  *See Burger King*, 471 U.S. at 472, 105 S.Ct. at 2182; *Madara*, 916 F.2d at 1516.  General jurisdiction is established by a defendant's "continuous and systematic" contacts with the forum. *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 415-16, 104 S.Ct. 1868, 1872-73 (1984); *see Consolidated Development v. Sherritt*, 216 F.3d 1286, 1291 (11th Cir. 2000).

If a plaintiff can show that minimum contacts exist on the basis of  specific or general jurisdiction, the burden then switches to defendant to prove that the exercise of jurisdiction over him would violate "fair play and substantial justice."  This burden is not insignificant: the defendant "must present a compelling case" for the unreasonableness of his being haled into a court in the forum state.  *Burger King*, 471 U.S. at 477, 105 S.Ct. at 2185; *see DeLong Equipment Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 854 (11th Cir. 1988).  The Eleventh Circuit weighs five factors  in the "fair play and substantial justice" determination: 1) the burden placed on defendant by being required to defend himself in the forum, 2) the forum state's interest in adjudicating the dispute, 3) plaintiff's interest in effective and substantial relief, 4) the efficient use of judicial

13

resources to resolve the dispute, and 5) the shared interest of the states in advancing basic social policies. *See Molina v. Marritt & Furman Insurance Agency, Inc.*, 207 F.2d 1351, 1358-59 (11th Cir. 2000); *Morris v. SSE, Inc.*, 843 F.2d 489, 495-96 (11th Cir. 1988). It is also true that a plaintiff can overcome a finding of insufficient contacts through the use of these five factors and thus compel the exercise of jurisdiction. *See Burger King*, 471 U.S. at 477, 105 S.Ct. at 2185; *Madara*, 916 F.2d at 1517.

In addition to arguing under the traditional two-step minimum contacts/reasonableness analysis, plaintiffs present an alternative path for the court to take in arriving at the conclusion that a defendant is amenable to service in this forum. Under the "conspiracy theory of personal jurisdiction" urged by plaintiffs, "jurisdiction can be obtained over a nonresident conspirator who has insufficient direct contacts with the forum when substantial acts in furtherance of the conspiracy were committed in the forum." *McDonald v. St. Joseph's Hospital of Atlanta, Inc.*, 574 F.Supp. 123, 127 (N.D.Ga. 1983). Although this niche of personal jurisdiction jurisprudence has elicited express support and rejection by courts, for example see *Textor v. Board of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1392-93 (7th Cir. 1983) (recognizing

14

the the conspiracy theory of personal jurisdiction under Illinois law); *National Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 773 (Tex. 1995) (refusing such recognition in Texas), no Alabama state court or federal court applying Alabama law has commented on this "conspiracy theory" formulation of what the Due  Process Clause allows.  *Cf. Posner v. Essex Insurance Co.*, 178 F.3d 1209, 1217-1218 (11th Cir. 1999) (applying in a Florida diversity case a five part conspiracy theory test announced in a Florida appellate court).

The state and federal cases applying Alabama law cited by plaintiffs support a broader idea, one not limited to a conspiracy allegation.  They recognize that a court, taking into account "'relevant facts and attendant circumstances'" may exercise jurisdiction within the bounds of due process over a nonresident defendant who has no direct contact with the forum.  *Shrout v. Thorsen*, 470 So.2d 1222, 1224 (Ala. 1985) (quoting *Alabama Waterproofing Company, Inc. v. Hanby*, 431 So.2d 141, 145 (Ala. 1983).  In *Shrout*, a case heavily relied upon in an opinion cited by plaintiffs, *Duke v. Young*, 496 So.2d 37 (Ala. 1986), the Supreme Court of Alabama held that a nonresident defendant, an alleged co-conspirator with no direct contact with Alabama, could be haled

15

into an Alabama court. *See Shrout*, 470 So.2d at 1224-26. The court did not find it necessary to analyze the personal jurisdiction issue in terms tailored to situations where the defendant is an alleged co-conspirator. *See id.* Instead, the court employed a straightforward analysis based on minimum contacts and fair play/substantial justice. See id. (relying in particular on the acknowledgment in *Calder v. Jones*, 465 U.S. 783, 789-90, 104 S.Ct. 1482, 1487, 79 L.Ed. 804 (1984), of the significance of distinguishing between allegations of tortious acts targeted at the forum and allegations of un-targeted tortious acts that ultimately resulted in injury in the forum). The court did go on to note that plaintiff's prima facie showing of a conspiracy "further strengthens the finding of in personam jurisdiction by the trial court." *Id.* at 1226. Thus, an evidentiary basis for the existence of a conspiracy was one of the facts and circumstances to be considered in resolving the personal jurisdiction issue. *See also Coblentz GMC/Freightliner, Inc. v. General Motors Corp.*, 724 F.Supp. 1364, 1368-71 (M.D.Ala. 1989)(embracing the "Calder theory of jurisdiction"); *Duke*, 496 So.2d at 40 (highlighting the targeted and untargeted distinction discussed in *Calder*).

Given the Alabama high court's forbearance of the conspiracy

16

theory and the adequacy of the traditional due process analysis to address circumstances involving conspiracy allegations, this court expresses reluctance to embrace the "conspiracy theory of personal jurisdiction." If a defendant, whether an alleged co-conspirator or not, is to be deemed amenable to service of process, a plaintiff must show that the defendant passes the minimum contacts and reasonableness prongs required by the Due Process Clause, as expressed in *International Shoe* and its progeny.

B.  <u>Analysis</u>

In undertaking the analysis that has the Court's language in *International Shoe* as its base, the court focuses, in turn, on the contacts of each of the six defendants challenging the power of this court over their person. On the reasonableness arm of the due process analysis, the court addresses considerations relevant to any or all defendants under each of the five factors.

1.  <u>Minimum Contacts</u>

The evidence before the court leaves no doubt that Foster has purposefully availed himself of this forum. His direct contacts include approximately 30 visits for SunCoast from 1992 to 1995, the

1995 meeting with Weaver and King, and the 1998 meeting with
Weaver.  As alleged by plaintiffs, these activities, intentionally
undertaken and aimed at Alabama, can at least be inferred to have
given rise to or relate to the cause of action.  Foster's numerous
visits for SunCoast from 1992 to 1995 were either to sell insurance
or conduct sales support, or both.  Similarly, in the 1995 meeting,
Foster,   King,   and   Weaver   discussed   sales   and   marketing
opportunities between Capitol and SunCoast.  Defendants' argument
that the 1998 meeting between Foster and Weaver involved matters
unrelated to plaintiffs' amended complaint relies on rejecting
Weaver's  recollection  of  what  was  discussed  at  that  meeting.
Weaver remembers discussing TLC's acquisition of CMG's assets.
Defendants seek to undercut Weaver's recollection with Foster's
deposition;  however,  while  Foster's  recollection  differs  from
Weaver's,  it  does  not  refute  Weaver's  statements.    Foster  is
certain of two things regarding the subject matter of the meeting:
the computer laptop enrollment system was discussed and other
matters were discussed.  This does not equal an assertion that
Weaver has erred in remembering that CMG's acquisition was a topic
of conversation.  The court finds no reasonable basis for doubting
Weaver's memory of the meeting.

Plaintiffs, including McFarlin, who sold insurance for Capitol

18

in Alabama during the 1992-1995 period, claim to have been injured by a diminution in sales and claim further that SunCoast and CMG were used to effect this harm.  Thus, as alleged, Foster's visits as president of SunCoast to this forum on matters of insurance sales and meetings with fellow defendants and alleged co-conspirators gave rise to the accusations leveled in plaintiffs' amended complaint.  Likewise, the 1998 Weaver-Foster meeting in part pertaining to the CMG asset acquisition transaction, an act plaintiffs allege was undertaken in furtherance of defendants' unlawful plan, gave rise to the cause of action.  While plaintiffs may ultimately fail to prove that some or any Foster's activities wrongfully contributed to a harm, that argument goes to the merits of plaintiffs' allegations.  It is enough to establish personal jurisdiction over Foster that the plaintiffs' allegations, or reasonable inferences from them, arise from or relate to Foster's acts or omissions in this forum.

King also passes the minimum contacts test.  His acts which constitute purposeful availment of this forum include roughly 12 business trips from 1992-1995, his 1995 meeting with Foster and Weaver, and his 1997 meeting with Morris.  These activities bear a relation to the amended complaint similar to Foster's contacts. Like Foster's early 1990s trips to Alabama, King's visits to

Alabama from 1992-1995 involved the sale of insurance products, including if not exclusively Capitol goods and services. Furthermore, King participated in the 1995 meeting with Foster and Weaver in Birmingham. Finally, King's 1997 meeting with Morris led to the establishment of CMG in the Hoover office. The phone calls made from this office, plaintiffs complain, contributed to their injury by interfering with their insurance sales businesses.

This court also has *in personam* jurisdiction over SunCoast. As corporate presence can only be manifested by the activities of its employees and agents, SunCoast's is amenable to service by virtue of King's and Foster's business trips from 1992 to 1995. *See International Shoe*, 326 U.S. at 316-17, 66 S.Ct. at 158.

CMG availed itself of the benefits and protections of Alabama's laws by assuming the Hoover office and operating it for a period of roughly two years. As stated above in reference to the King-Morris meeting, plaintiffs assert that the complained of interference was carried out from this office.

Conseco's contacts with this forum stem from its involvement in the transactions that resulted in Conseco's acquisition of the Hoover office. Defendants state that discussions leading up to the sale were held in Carmel, Indiana, where Conseco is located.

20

According to Foster, the discussions involved Sharpe, whom Foster believes was president of Conseco Health at that time.  However, this belief is contradicted by the black-and-white of the agreement.  Article 12.3 of that contract lists the names, addresses, and fax and phone numbers of individuals to be sent any notice required under the agreement.  Sharpe is one of the two persons designated to receive any notice sent to the purchaser, that is, TLC.  Both of TLC's designated recipients are listed as Conseco employees.  Thus, it seems reasonable to infer that Sharpe's involvement in the negotiations was in a capacity for Conseco.

Other provisions of the agreement and Conseco's public statement subsequent to the sale indicate the significance of Conseco's role in the TLC-CMG transaction.  It was Conseco itself, not any of its subsidiaries, that was recipient of $2 million of the purchase price, guarantor of the $3 million hold back payment, and recipient, through Sharpe and another, of any notice or document to be sent to TLC.  Furthermore, Conseco issued a press release one day after the date of the sale that it, not one of its subsidiaries, had acquired CMG and TLC.  Taken together, indications of Conseco's involvement in negotiations that prefaced the CMG transactions, its role in the CMG-TLC asset acquisition as

21

evidenced by the agreement itself, and its announcement that it had acquired on the same day as the TLC-CMG transaction both TLC and CMG provide a basis to believe that Conseco actively participated in the planning and execution of the CMG-TLC transactions.

However, this belief in and of itself does not answer the question of whether this court has *in personam* jurisdiction over Conseco. First, the activity attributed to Conseco must have resulted in purposeful availment of the benefits and protections of the laws of this forum. The essential fact here is that among the CMG assets discussed, acquired, thus landing, as announced in its own press release, in Conseco's lap, included the Hoover office. It was specified as one of the assets passing hands in the CMG-TLC agreement and it is reasonable to believe that it was included in the subsequent acquisition by Conseco, whatever its technical transactional nature. Second, as mentioned above, the Hoover office is the alleged locale of some of the activities plaintiffs base their amended complaint. Furthermore, plaintiffs assert that Conseco's participation in the alleged conspiracy involved its participation in the CMG transactions.

The court notes that plaintiffs have also tried to establish jurisdiction over Conseco on a specific or general jurisdictional basis through the contacts of its subsidiaries. This circuit has

not substantially veered from the Supreme Court's holding in *Canon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333, 337, 45 S.Ct. 250, 251 (1925), that the presence of a subsidiary in a forum will not be imputed to a parent as long as the entities are separate and distinct. *See Consolidated Development*, 216 F.3d at 1293; *Portera v. Winn Dixie of Montgomery*, 996 F.Supp. 1418, 1423-25 (M.D.Ala. 1998); *see also, e.g., Coca-Cola Company v. Proctor & Gamble Company*, 595 F.Supp. 304, 306-08 (N.D.Ga. 1983) (relying on evidence of "interlocking directorates, commonality of officers, and necessity of parent review and approval of subsidiary actions" to find a sufficient amount of control). There is insufficient evidence in the record to establish that this standard is met; however, the court is of the opinion that such a showing is precluded by Conseco's responses, or lack thereof, to plaintiffs' interrogatories and requests for production. Were this court unsatisfied with the nature of Conseco's contacts with this forum through the CMG asset transactions, it would be obliged to grant, with only minor modification, plaintiffs' motion to compel discovery regarding Conseco.

In contrast to Conseco, CMG, SunCoast, King, and Foster, Hobbs engaged in activities, in and out of Alabama, that do not bear a

significant relation to the cause of action alleged by plaintiffs.
Hobbs's direct contacts with Alabama stem from his supervision of
the Hoover office for PMA/TLC after the CMG/TLC transactions. For
about sixty days he made calls at least once a week to speak to the
office manager, Whitt. There is no evidence in the record to
support the belief that his purpose in making these calls was
simply to ensure that day-to-day and week-to-week operations went
smoothly. Therefore, even if his supervisory acts amount to
purposeful availment, their relation to the cause of action is not
strong enough to justify subjecting him to the personal
jurisdiction of this court. Plaintiffs correctly point out that
activities outside the forum may provide a basis for personal
jurisdiction within the forum, but here too they fall short.
Plaintiffs deposed Hobbs, but revealed no contact with other
alleged co-conspirators that could be reasonably inferred to relate
to the cause of action. The record reveals that he worked with or
under Weaver at Capitol, Conseco Services, TLC, and finally PMA.
While it is within the realm of possibility that Hobbs took part in
some of the activities and omissions complained of, satisfaction of
such a low standard does not safeguard Hobbs's due process rights.
The record leaves the court with only a "guilt by association"
basis for assuming for the purposes of the question before it that

Hobbs conspired with defendants who are amenable to service of process in this forum and therefore subject to its jurisdiction himself.

### 2.  Fair Play and Substantial Justice

Having found that Foster, King, SunCoast, CMG, and Conseco have sufficient minimum contacts with this forum and that Hobbs does not, this court now turns to the second arm of the due process inquiry to determine whether concerns of fair play and justice counsel a reining in or an extension of the long-arm lasso.

The court first weighs the burden placed on defendants by defending themselves in this forum.  The burden placed on Conseco is not insignificant, but assumedly is  one which it can well absorb.   Foster, King, SunCoast, and CMG are located in a neighboring state from which, with the aid of modern transportation, they may reasonably be expected to travel to this forum.  In the past they have undertaken that trip, and it is out of some of those visits that plaintiffs allege that the amended complaint arises. As for Hobbs, the burden on him would not be so slight as to overcome his lack of minimum contacts.

Regarding the interests of the forum, defeendants correctly point out that protection of the rights of a resident plaintiff,

25

the frequent fact cutting in favor of personal jurisdiction, is absent.  However, it may be said that a state has an interest in correcting wrongs, whether done to a resident or non-resident, occurring within its boundaries.  McFarlin complains in part of the injuries done to him in Alabama.  Failure to provide a forum in this case would undercut the security non-residents conducting business in this state have in the potential that wrongs done to them here can be righted here.  While this motivation may be slight compared to the usual interest of providing a forum for residents to seek relief, it does, to that slight degree, exist.

Plaintiffs' interest in convenient, effective relief cuts in favor of jurisdiction.  For reasons more fully explained below in Part III of this opinion discussing defendants' motions to transfer, the court doubts whether another forum exists where all defendants except Hobbs or perhaps even most of defendants besides Hobbs would be amenable to service of process.  If this court were to dismiss the six defendants moving for dismissal for lack of personal jurisdiction, plaintiffs would face the choice of seeking relief against all defendants in separate suits, which would not be convenient, or seeking relief in a single suit in a forum where key defendants may avoid personal jurisdiction, which may not be effective.  In contrast, if this court does not overturn its

26

findings under the minimum contacts analysis, Hobbs will be dismissed. However, as plaintiffs have failed to tie him in any significant way to the acts that form the basis for their amended complaint, dismissing Hobbs from this action would have little, if any, impact on plaintiffs' search for effective relief.

Given its doubt over whether all or most of defendants could be haled into another forum, the court finds that the interest of the efficient use of judicial resources favors the exercise of personal jurisdiction. If forced to pursue relief outside this forum, plaintiffs' pursuit could result in inefficient, multiple litigation.

Defendants have presented no argument nor does the court itself detect any argument that could be made for the relevance of the factor of furthering the states' collective interest in basic social policies. The court considers it neutral factor.

Balancing these factors, the court finds that it may exercise personal jurisdiction over Foster, King, SunCoast, CMG, and Conseco without running afoul of the essential notions of fair play and justice. Similarly, the weight of the factors in regards to Hobbs is not so heavy as to justify haling him into the forum despite the insufficiency of his contacts.

27

II.  Defendants' Motions to Dismiss for Improper Venue

On the question of venue, defendants first argue that the Northern District of Alabama is not the proper forum for this action.  28 U.S.C. § 1391(a) provides three bases for finding a forum proper in a diversity action.  At issue here is § 1391(a)(2), which establishes that venue is proper in a forum where a substantial portion of the acts giving rise to the action took place.  As made clear in the recitation of facts and discussion of the minimum contacts and "fair play and substantial justice" prongs of the personal jurisdiction analysis, significant aspects of the events complained of took place here.   It is alleged that for roughly three years harm was done to one of the plaintiffs in this forum, that three meetings that advanced the conspiracy were held here, and that for approximately two years this forum was the location of activities that converted the customer bases of plaintiffs.  That the alleged illegal scheming took place for a number of years in a number of additional forums does not diminish the substantiality of what occurred in the Northern District of Alabama.

III.  Defendants' Motions to Transfer Venue

28

A. Discussion

Even if the forum is proper, defendants' motions to transfer may be granted under 28 U.S.C. § 1404(a). Section 1404(a) gives a district court broad discretion to transfer a civil action to a district where the action could have been brought initially "for the convenience of parties and witnesses, in the interests of justice." When venue is proper, a defendant bears the burden of showing that § 1404(a) is met. See In re Ricoh Corp., 870 F.2d 570, 573 (11th Cir. 1989); Folkes v. Haley, 64 F.Supp.2d 1152, 1154 (M.D.Ala. 1999). A plaintiff's choice of forum will not be disturbed unless the defendant can show that other considerations clearly tip the scales in favor of an alternative forum. See Robinson, 74 F.3d at 260; Gould v. National Life Insurance Co., 990 F.Supp. 1354, 1357 (M.D.Ala. 1998). However, a court should not show deference to a plaintiff's choice if the plaintiff does not reside in the chosen forum or if operative facts underlying the cause of action did not occur within that forum. See Merritt v. Jay Pontiac-GMC Truck, Inc., 952 F.Supp. 754, 756 (M.D.Ala. 1996); Prather v. Raymond Constr. Co., 570 F.Supp. 278, 284 (N.D.Ga. 1983).

As a threshold matter, the proposed transferee court must be

29

one in which the action could have been brought originally.   28

U.S.C. § 1404(a); *see Van Dusen v. Barrack*, 376 U.S. 612, 616, 84

S.Ct. 805, 809, 11 L.Ed.2d 945 (1964); *Hoffman v. Blaski*, 363 U.S.

335, 340-44, 80 S.Ct. 1084, 1088-1090, 4 L.Ed.2d 1254 (1960).   To

carry the burden of supporting transfer, then, a defendant must

show that the proposed transferee court would have subject matter

jurisdiction over the case, would be a proper venue under 28 U.S.C.

§ 1391, and would be able to exercise personal jurisdiction over

the defendant within the bounds of the applicable state long-arm

statute and the Due Process Clause.   *See Miot v. Kechijian*, 830

F.Supp. 1460, 1465 (S.D.Fla. 1993); *Martin v. South Carolina Bank*,

811 F.Supp. 679, 683 (M.D.Ga. 1992).   The requirements of venue and

personal jurisdiction regarding the transferee forum have to be met

at the time the action was initially filed and can not later be

waived.   *See Hoffman*, 363 U.S. at 342-44, 80 S.Ct. at 1089-1090;

*Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509,

1515 (10th Cir. 1991).   Where there are multiple defendants, all

defendants must be amenable to service in the transferee forum.

*See Hoffman*, 376 U.S. at 342-44, 80 S.Ct. at 1089-1090; *Sunbelt*

*Corp. v. Noble, Denton & Associates, Inc.*, 5 F.3d 28, 33 (3rd Cir.

1993); *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 24 (3rd Cir. 1970);

*Watwood v. Barber*, 70 F.R.D. 1, 9 (N.D.Ga. 1975); *see also Liaw Su Teng v. Skaarup Shipping Corp.*, 743 F.2d 1140, 1150 (5th Cir. 1984) (acknowledging the general rule, but finding an exception "where both parties have, by their procedural maneuvers, effectively consented to jurisdiction and venue in the transferee forum").

    B.  <u>Analysis</u>

It appears that defendants clear the hurdles of venue and subject matter jurisdiction, but stumble on personal jurisdiction. CMG, SunCoast, Foster, and King propose the Northern District of Texas as an alternative. Despite the fact that these defendants quote § 1404(a), including the words "might have been brought," they do not address the implications of its language. They brush the issue in discussing the  concern of the convenience of the parties where they state that Hobbs, Weaver, and PMA reside in the Northern District of Texas. This leaves unaddressed the contacts of the other seven defendants, including themselves, with that forum. An independent examination of the record does indicate that Conseco Services may be amenable to service in that forum. Nevertheless, the record gives only an inkling that an argument may be made that Conseco has contacts with the Northern District of

Texas.   The record fails to reveal any contacts whatsoever that CMG, SunCoast, King, Foster, and Conseco Health may have with the forum.   This court will leave aside the restrictions of Texas's long-arm statute that a Northern District of Texas court would have applied had the action initially been brought in that forum.   It is enough to say that King, Foster, SunCoast, and CMG have failed to carry their burden of showing that due process would not have prevented numerous defendants from being amenable to service there.

The other proposed alternative forum, the Southern District of Indiana, is urged by all defendants with motions before this court. One sentence contains the extent of their basis for personal jurisdiction in that court: "This action originally could have been brought in the Southern District of Indiana because Conseco Health, Conseco, Inc., and Conseco Services, LLC reside in the Southern District of Indiana and are subject to personal jurisdiction there...."   The court agrees, but this does not settle the issue.

Section 1404(a) again compels this court to examine the record for facts relevant to the amenability of non-Conseco-related defendants' to service of process in the alternative forum.   As above, the court places to the side the matter of the relevant state statute that a federal diversity court sitting in the proposed transferee forum would apply.   The record shows that in

32

all likelihood Weaver could be haled into court in the alternative forum without violating his due process rights. Although the same might be said of Foster, his contacts appear to be fewer and more isolated. Based on the record, the extent of his contacts appear to consist of an unspecified number of meetings in Carmel, Indiana to discuss the CMG asset acquisition with Weaver and Sharpe. Foster also states that he had phone conversations about this sale, but defendants do not establish how many calls there were, whether they involved the Southern District of Indiana, and if so, whether Foster made the calls or merely received them. King's contacts with the forum are more tenuous still. Like Foster, his purposeful availment appears most likely to relate to the CMG asset acquisition. The evidence indicates only that he either made calls to or received calls from Weaver regarding the transaction. Whether Weaver was in the Southern District of Indiana for these calls is unclear. Furthermore, the nature and extent of PMA's, CMG's, and SunCoast's contacts with the Southern District of Indiana are completely unexamined. Whether they approach anything near the sufficiency required by due process is an open question.

To grant transfer to either of the alternative forums based on the evidence before the court would run the risk of turning § 1404(a) into much more than a "federal judicial housekeeping

measure ... intended, on the basis of convenience and fairness, simply to authorize a change of courtrooms." *Van Dusen*, 376 U.S. at 636, 84 S.Ct. at 819.

Even if defendants were able to satisfy this court that the Southern District of Indiana or Northern District of Texas could exercise power over defendants in this action, the court doubts that they could convince it that transfer should occur based on considerations of convenience and justice. A plaintiffs' choice of forum will be given deference if operative facts are alleged to have occurred in the forum. *See Merritt*, 952 F.Supp. at 756; *Prather*, 570 F.Supp. at 284. Not only did alleged operative facts take place in Alabama, this forum appears to have a unique relationship to this action. As alleged, this is the one forum where defendants planned their conduct (in the 1995 Weaver-Foster-King meeting and 1998 Weaver-Foster meeting), where they carried out (through the calls made from the Hoover office from June 1997 to July 1999), and where harm was done (to McFarlin's Alabama customer base). Given the deference due plaintiffs' choice of forum, this court is unconvinced that any measurable, bottom-line gain in convenience from a transfer to Indiana would be enough to overcome the consideration due plaintiffs' choice.

IV.  <u>Defendants' Motion for a More Definite Statement</u>

CMG, SunCoast, Foster, and King make a motion for a more definite statement under Rules 12(e) and 9(b) of the Federal Rules of Civil Procedure.  While Rule 12(e) requires enough specificity to put a defendant on notice, Rule 9(b) calls for additional particularity when fraud is alleged.  Under Eleventh circuit law, Rule 9(b) requires that a complaint include:

> (1) precisely what statements were made in what documents or oral  representations or what omissions were made, and
> (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and
> (3) the content of such statements and the manner in which they misled the plaintiff, and
> (4) what the defendants "obtained as a consequence of the fraud."

*Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997) (citing *Fitch v. Radnor Industries, Ltd.*, No. 90-2084, 1990 WL 150110, at *2 (E.D.Pa. Sept. 27, 1990)). However, there are alternative means of satisfying the rule.  *See id.* Furthermore, if a defendant controls the information necessary to meet the Rule 9(b) standard, a relaxed analysis is called for. *See Peters v. Amoco Oil Co.*, 57 F.Supp.2d 1268, 1280-1281 (M.D.Ala.

35

1999); *United States v. East Ala. Healthcare Auth.*, 953 F.Supp. 1404, 1413 (M.D.Ala. 1996).

In their amended complaint, plaintiffs allege fraud, tortious interference, conspiracy, breach of contract, and unjust enrichment/restitution. Under the fraud count, they provide a non-exclusive list of matters which allegedly either were misrepresented, concealed, or not disclosed by defendants. However, the list does not provide the individuals involved in, the date or time frame of, or location of the misrepresentation, concealment or failure to disclose that constitutes the alleged fraud. In an action involving multiple defendants and multiple plaintiffs where plaintiffs' allegations cover many years and many states, greater particularity is necessary for Rule 9(b) to have any meaning. While plaintiffs' inability to present the requisite specifics may be excusable, those circumstances have not been brought to the attention of this court. Furthermore, the categories of the matters listed would seem to indicate that at least some information lies within plaintiffs' collective reach.

### Conclusion

A separate and appropriate order will be entered ruling on the

motions addressed in this opinion and remaining pending motions.

DONE this ___19___ day of October, 2000.


WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE