IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DANNY MCFARLIN, et al.,    )
    )
    Plaintiffs,    )
    )
    )    CIVIL ACTION NO.
v.    )    99-AR-2282-S
    )
CONSECO SERVICES, LLC, et    )
al.,    )
    )
    Defendants.    )
    )
    * * * * *    )    CONSOLIDATED WITH
    )    02-AR-2874-S
DAVID KING, et al.,    )
    )
    Plaintiffs,    )
    )
v.    )
    )
NATIONWIDE MUTUAL INSURANCE    )
COMPANY,    )
    )
    Defendant.    )



## <u>MEMORANDUM OPINION</u>

Before the court are cross motions for partial summary judgment filed by plaintiffs, David King ("King"), Michael Foster ("Foster"), Suncoast Fringe Benefits, Inc. ("Suncoast"), and Consolidated Marketing Group, Inc. ("CMG") [collectively "King plaintiffs"], and by defendant, Nationwide Mutual Insurance Company ("Nationwide"). The motions were filed upon the court's request in its August 26, 2003 order denying Nationwide's motion to dismiss. Also before the court is the motion of the King plaintiffs for an entry of default judgment against Nationwide.



### I.  Undisputed Facts

On August 31, 1999, *McFarlin v. Conseco*, CV-99-AR-2282-S, was filed against the King plaintiffs and others.  After two amendments to the original complaint, the *McFarlin* plaintiffs presented six counts or claims against the King plaintiffs and others: fraud, tortious interference, conspiracy, breach of contract, unjust enrichment/restitution, and a RICO claim.[1]  On May 18, 2001 the King plaintiffs provided Nationwide with a copy of the first amended complaint and demanded that Nationwide defend and provide coverage under four insurance policies they had obtained from Nationwide.[2]  In January 2002, after several

---

[1] There is a dispute between the parties as to whether the Amended Complaint or the Second Amended Complaint governs in the instant case.  Nationwide argues that it was never given notice of the Second Amended Complaint and that it cannot have breached a duty to defend against the Second Amended Complaint when it had no notice it.  Nationwide relies primarily on *Hagen v. Aetna Cas. & Sur. Co.*, 675 So.2d 963 (Fla. Dist. Ct. App. 1996).  In *Hagen,* the court stated that "Florida courts discourage trial by ambush. [The insurer] should not be liable for failing to defend a cause of action not brought to its attention."  *Hagen,* 675 So.2d at 968.  *Hagen* is distinguishable from the instant case because the amended complaint was never brought to the attention of the insurer in *Hagen.*  Nationwide has notice of the Second Amended Complaint, it is referred to throughout its briefs on the Rule 56 motions.  This court believes that the notice to Nationwide was sufficient.  Therefore, the Second Amended Complaint governs in this case.

[2] The policies were actually issued to Suncoast and CMG, but King and Foster, as owners of the two companies, are also covered under the policies.

follow-up letters, Nationwide responded to the May 18, 2001 letter.[3]  In its response, Nationwide denied coverage to the King plaintiffs, saying that the acts as alleged took place prior to the effective dates of the policies.  Nationwide, therefore, declined to provide a defense to the King plaintiffs in the underlying *McFarlin* action.

On November 25, 2002, the King plaintiffs filed CV-02-AR-2824-S, alleging breach of contract and bad faith by Nationwide. Nationwide filed a motion to dismiss or, alternatively, to abate the bad faith count.  On August 26, 2003, this court denied the motion to dismiss without prejudice to Nationwide's refiling it if the court later found in favor of the King plaintiffs on the question of coverage.  In the same order, the court invited the parties to "file motions for partial summary judgment addressing only the coverage question."  The parties then filed the motions that are now before this court.

There are four insurance policies at issue:

1. A businessowners policy issued by Nationwide to CMG effective from October 20, 1997 to September 9, 1999.

2. A commercial umbrella policy issued by Nationwide to CMG effective from October 20, 1997 to September 9, 1999.

3. A businessowners policy issued by Nationwide to Suncoast

---

[3] Nationwide actually sent two letters, one on January 9, 2002 to CMG and one on January 15, 2002 to Suncoast.  The letters are virtually identical.

effective from March 29, 1996 to November 15, 2000.

4. A commercial umbrella policy issued by Nationwide to Suncoast effective from March 29, 1996 to November 15, 2000.

The businessowners policies issued to CMG and Suncoast are identical, as are the umbrella policies issued to each company. The businessowners policy provides in pertinent part:

A. **COVERAGES**
    1. **Business Liability**
        a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury"...[or] "personal injury"...to which this insurance applies.  We will have the right and duty to defend any "suit" seeking those damages.
        b. This insurance applies:
            (1) To "bodily injury"...only if:
                (a) The "bodily injury"...is caused by an "occurrence"...; and
                (b) The "bodily injury"...occurs during the policy period.
            (2) To:
                (a) "Personal injury" caused by an offense arising out of your business...;
                . . .
                but only if the offense was committed... during the policy period.

B. **EXCLUSIONS**
    1. **Applicable to Business Liability Coverage**
        This insurance does not apply to:
        a. "Bodily injury"...expected or intended from the standpoint of the insured.

F. **LIABILITY AND MEDICAL EXPENSES DEFINITIONS**
    3. **"Bodily injury"** means bodily injury, sickness or disease sustained by a person....
    9. **"Occurrence"** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
    10. **"Personal injury"** means injury, other than "bodily injury," arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;
b. Malicious prosecution;
c. The wrongful eviction from, wrongful entry
into, or invasion of the right of private
occupancy of a room, dwelling or premises that a
person occupies, by or on behalf of its owner,
landlord or lessor.
d. Oral or written publication of material that
slanders or libels a person or organization or
disparages a person's or organization's goods,
products or services; or
e. Oral or written publication of material that
violates a person's right of privacy.

(emphasis in original).

The umbrella policy provides in pertinent part:

**I. COVERAGE**
<u>We</u> will pay on behalf of the <u>insured</u> the <u>ultimate net
loss</u> in excess of the <u>underlying limit</u> or the <u>retained
limit</u>, whichever is greater, because of <u>bodily
injury</u>...[or] <u>personal injury</u>...to which this policy
applies, caused by an <u>occurrence</u>....

**VII. Definitions**
F. <u>Bodily injury</u> means <u>bodily injury</u>, sickness,
disease, disability, shock, mental anguish or mental
injury which occurs during the policy period....
J. <u>Occurrence</u> means:
    1. An accident...which results in <u>bodily
    injury</u>...neither expected nor intended from the
    standpoint of the <u>insured</u>.
    ...
    3. An offense within the definition of <u>personal
    injury</u>.
K. <u>Personal injury</u> means injury...arising out of one or
more of the following offenses committed during the
policy period in the conduct of <u>your</u> business:
    1. False arrest, detention or imprisonment, or
    malicious prosecution.
    2. The publication or utterance of libel or
    slander or of other defamatory or disparaging
    material, or of publication or utterance in
    violation of an individual's right of privacy.
    3. Wrongful entry or eviction, or other invasion
    of the right of private occupancy.
    4. Humiliation.
    5. Discrimination against a natural person unless

5

> intentional or unless insurance is prohibited by
> law.

(emphasis in original).

## II.  Analysis

### A. *Motion for Default Judgment*

The King plaintiffs ask that an entry of default be entered against Nationwide pursuant to Rule 12(a)(4), Federal Rules of Civil Procedure.  Rule 12(a)(4) provides:

> *Unless a different time is fixed by court order,* the
> service of a motion permitted under this rule alters
> these periods of time as follows:
>       (A) if the court denies the motion or postpones
>       its disposition until the trial on the merits, the
>       responsive pleading shall be served within 10 days
>       after notice of the court's action....

(emphasis supplied).  The King plaintiffs argue that Nationwide did not file an answer within 10 days of this court's August 26, 2003 denial of the motion to dismiss, and, therefore, a default judgment should be entered against them.

Nationwide responds that the court's August 26, 2003 order altered the time in which it had to file an answer.  The court's order denied the motion to dismiss without prejudice to Nationwide's refiling the motion if the court ruled for the King plaintiffs on the coverage issue upon submission of the Rule 56 motions.  Nationwide has presented an accurate statement of the effect of this court's August 26, 2003 order.  Therefore, the motion for default judgment is not well-taken and will be

6

denied.[4]

## B. Choice of Law

A federal court sitting in diversity, as this court does in the instant case, applies the substantive law of the state in which it sits.  Therefore, Alabama substantive law applies.  This includes Alabama choice of law rules.  Under Alabama choice of law rules, the state where the contract was executed governs the interpretation of the contract.  *Indus. Chem. & Fiberglass Corp. v. North River Ins. Co.*, 908 F.2d 825, 829 n.3 (11th Cir. 1990).  The parties do not dispute that the contracts were executed in Florida.  Therefore, Florida contract law applies.  However, as discussed in this court's May 27, 2003 opinion on the Rule 56 motions filed in the *McFarlin* action, Alabama law governs the underlying tort claims.

## C. Duty to Defend

In *SM Brickell Ltd. Partnership v. St. Paul Fire & Marine Ins. Co.*, 786 So.2d 1204 (Fla. Dist. Ct. App. 2001), a Florida Court of Appeals explained an insurer's duty to defend as follows:

---

[4] Although Nationwide did not file an answer within 10 days of this court's denial of the motion to dismiss, it did file an answer on October 31, 2003.

A liability insurer's duty to defend is controlled by
the allegations in the complaint against the insured,
even if they may be factually incorrect or without
merit.  When an amended complaint supersedes an earlier
one, the allegations of the amended complaint control
the duty to defend.  If the complaint alleges facts
that create potential coverage under the policy, an
insurer must defend the lawsuit, even "where ... there
has been a suggestion made that the purported negligent
allegations are really allegations of intentional acts
in disguise."

*SM Brickell,* 786 So.2d at 1206. (citations omitted).

A Florida U.S. District Court similarly explained:

In Florida, as in other jurisdictions, an
insurer's duty to defend hinges on whether the
allegations of the complaint state a claim which
potentially falls within the coverages defined by the
policy. This question is resolved strictly by reference
to the allegations of the underlying complaint, not by
the actual facts, the insured's version of the facts or
the insurer's defenses. Within these confines, the
central inquiry is whether the allegations "fairly and
potentially" bring the transaction within the coverage
provisions of the policy.  Thus, it is said that the
duty to defend is broader than the duty to indemnify,
in the sense that the insurer must defend even if the
facts alleged are actually untrue, or the legal
theories unsound.

Where there is any doubt as to whether the duty to
defend exists in a particular case, this question must
be resolved against the insurer and in favor of the
insured.  Moreover, where multiple claims are lodged,
some within and some outside coverage, the insurer is
obligated to defend the entire case so long as the
underlying complaint alleges facts constituting at
least one cause of action covered by the policy.

In laying the allegations of the complaint against
the terms of the policy in determining the potential
for coverage, the interpretational analysis begins with
the basic legal principle in Florida that insurance
contracts are to be construed in accordance with the
plain language of the policies as bargained for by the

8

parties, with any ambiguities interpreted liberally in
favor of the insured and strictly against the insurer
who prepared the policy.  If the relevant policy
language is susceptible to more than one reasonable
interpretation, one providing coverage and another
limiting coverage, an ambiguity is deemed to exist by
definition and the court is bound to adopt the
interpretation which favors coverage.
       Florida law is equally well-settled that insuring
or coverage clauses are to be construed in the broadest
possible manner to effect the greatest extent of
coverage.  On the other hand, insurance policy
exclusions are construed in the narrowest possible
manner, again with an eye toward maximizing the
coverages afforded.  More generally, in interpreting an
insurance policy in accordance with these precepts,
Florida law requires the court to look at the policy as
a whole, and to give meaning to all of its terms.

*Adolfo House Distrib. Corp. v. Travelers Property and Cas. Ins.*

*Co.*, 165 F.Supp.2d 1332, 1335-36 (S.D. Fla. 2001) (citations

omitted).  As explained by the *Adolfo* court, the duty to defend

is broader than the duty to pay or indemnify.  *Id.* at 1335.

Because a factual issue remains with respect to the duty to pay,

the court will only address the duty to defend in this opinion.

### D. Duty to Defend Under the Insurance Policies

    The King plaintiffs argue that Nationwide is obligated to

defend them in the underlying *McFarlin* action pursuant to the

businessowners and umbrella policies, because the *McFarlin*

plaintiffs alleged that they suffered "bodily injuries" and

"personal injuries" as a result of the actions of the King

plaintiffs.  Nationwide sets forth three reasons why they have no
duty to defend the King plaintiffs in the *McFarlin* action: (1)
the allegations of the *McFarlin* plaintiffs do not meet either the
definition of "bodily injury" or the definition of "personal
injury" as set out in the insurance policies; (2) the allegations
in the *McFarlin* complaint deal with intentional actions on the
part of the King plaintiffs, which does not meet the definition
of "occurrence" as set out in the insurance policies; and (3) the
acts complained of in the *McFarlin* complaint occurred outside of
the effective dates of the insurance policies, and thus, are not
covered.  The court will deal with each of these arguments in
turn.

    1. Whether the Acts Complained of Constituted "Bodily Injury"
and/or "Personal Injury"?

a. Businessowners Policies

As set out above, the businessowners policies say that
"bodily injury" means "bodily injury, sickness or disease
sustained by a person...."  The King plaintiffs argue that the
*McFarlin* plaintiffs alleged "bodily injury" in their fraud claim.
The fraud claim alleged that, as a result of the King plaintiffs'
fraud and suppression, the *McFarlin* plaintiffs suffered "mental
and emotional anguish."  *McFarlin* Second Am. Compl. ¶ 158.  The

King plaintiffs argue that "bodily injury, sickness or disease" includes mental anguish.  They rely primarily on *McGuire v. Am. States Ins. Co.,* 491 So.2d 606 (Fla. Dist. Ct. App. 1986), and *Am. Motorists Ins. Co. v. S. Sec. Life Ins. Co.,* 80 F.Supp.2d 1280 (M.D. Ala. 2000) (applying Florida law).  Both *McGuire* and *American Motorists* held that mental anguish can constitute "bodily injury."  However, in both cases, physical manifestations of bodily injury were present.  *See McGuire,* 491 So.2d at 608; *American Motorists,* 80 F.Supp.2d at 1283.

In *McGuire,* the court noted that the insured "suffered mental distress, headaches, and muscle spasms which required treatment and medication, and interfered with her ability to perform her job." *McGuire,* 491 So.2d at 608.  Therefore, the court held that the insured's "complaints may be construed as bodily injury involving 'sickness and disease'...." *Id.*  The *McGuire* court relied on the insured's answers to interrogatories in which she detailed her injuries.  *Id.* at 607.

In *American Motorists,* the insureds stated in answers to interrogatories that they "suffered physical manifestations of mental anguish such as sleeplessness, stomach cramps, headaches and the like." *American Motorists,* 80 F.Supp.2d at 1283.  The court then noted that "[i]n Florida, a plaintiff's mental anguish which results in physical manifestations may constitute bodily

injury." *Id.* (citing *McGuire,* 491 So.2d 606). The *American Motorists* court held that the insureds' alleged damages met the definition of "bodily injury." *Id.*

Neither of these cases dealt solely with the issue of the duty to defend. As a result, both courts looked beyond the allegations in the complaint.[5] However, Florida law is clear that in determining whether the duty to defend exists, the court looks only to the allegations in the complaint. The issue before the court is whether simply alleging "mental and emotional anguish" is sufficient to trigger Nationwide's duty to defend based on the "bodily injury" provision of the insurance policies when no allegation has been made regarding physical manifestations of the "mental and emotional anguish." Resolving doubts in favor of the insured and against the insurer, as the court must, this court believes that under Florida law such allegations are sufficient to trigger the duty to defend. *See Adolfo House,* 165 F.Supp.2d at 1336.

Having decided the "bodily injury" issue, the court will turn to the issue of whether "personal injuries," as defined by the businessowners policies, were alleged in the *McFarlin* complaint. The businessowners policies define "personal injury"

_____

[5] Neither party presented evidence addressing whether or not the *McFarlin* plaintiffs suffered any physical manifestations as a result of their mental anguish.

as:

> injury, other than "bodily injury," arising out of one or more of the following offenses:
>
> A. False arrest, detention or imprisonment;
>
> B. Malicious prosecution;
>
> C. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, by or on behalf of its owner, landlord or lessor.
>
> D. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or
>
> E. Oral or written publication of material that violates a person's right of privacy.

The *McFarlin* plaintiffs have not alleged any harm that even arguably falls under this definition.  Therefore, the court finds that Nationwide has no duty to defend based on the coverage for "personal injuries" under the businessowners policies.

### b. Umbrella Policies

The umbrella policies define "bodily injury" as "bodily injury, sickness, disease, disability, shock, *mental anguish or mental injury*...." (emphasis supplied).  In its Rule 56 motion, Nationwide admits that "[a]rguably, the [*McFarlin*] plaintiffs' allegations of 'mental and emotional anguish' could constitute 'bodily injury' within the context of the Nationwide umbrella

13

policies...."[6]  Def. Mot. Summ. J. at 30.  Unlike its analysis of the businessowners policies, the court need not decide if "bodily injury" includes mental anguish, because the umbrella policies define "bodily injury" to include "mental anguish."

Turning to the whether "personal injuries" were alleged in the *McFarlin* complaint, the umbrella policies define "personal injury" as an

> injury...arising out of one or more of the following offenses committed during the policy period in the conduct of your business:
>
> > 1. False arrest, detention or imprisonment, or malicious prosecution.
> >
> > 2. The publication or utterance of libel or slander or of other defamatory or disparaging material, or of publication or utterance in violation of an individual's right of privacy.
> >
> > 3. Wrongful entry or eviction, or other invasion of the right of private occupancy.
> >
> > 4. *Humiliation*.
> >
> > 5. Discrimination against a natural person unless intentional or unless insurance is prohibited by law.

(emphasis supplied).  The *McFarlin* plaintiffs alleged that, as a result of the King plaintiffs' actions, they suffered humiliation.  *See McFarlin* Second Am. Compl. ¶¶ 6, 8, 10, 11, 13, 15, 16, 17, 20.  The King plaintiffs argue that those allegations

---

[6] Nationwide argues that they have no duty to defend under the umbrella policies because the allegations in the complaint do not meet the definition of "occurrence" and because the actions complained of took place outside of the coverage dates of the umbrella policies.

meet the definition of "personal injury" because the definition specifically includes "humiliation."

Nationwide counters that the "personal injury" must be a specifically enumerated tort in the underlying complaint in order to meet the definition of "personal injury" in the umbrella policies.   The "personal injury" provision of the policies say "one or more of the following *offenses*."   (emphasis supplied). Nationwide argues that "there is a clear distinction between humiliating *conduct*, and humiliation as an *element of damages*...." Def. Resp. Mot. Summ. J. at 13.   (emphasis in original).   The *McFarlin* complaint sets forth claims for fraud, tortious interference, conspiracy, breach of contract, unjust enrichment/restitution, and a RICO claim.   Because the complaint does not specifically make a claim for humiliation, then, according to Nationwide, the "personal injury" definition in the umbrella policies has not been met.

Nationwide cites *St. Paul Fire & Marine Ins. Co. v. Naples Community Hosp.*, 585 So.2d 374 (Fla. Dist. Ct. App. 1991), in support of its argument.[7]   *Naples,* like the instant case, involved a dispute over an insurer's duty to defend the insured in an underlying action.   *Id.* at 375.   The underlying complaint

_____

[7] Nationwide cites additional cases from a variety of other jurisdictions.   Because Florida law is the applicable law in this case, the court need not consider the law of other jurisdictions.

sought damages for conspiracy in restraint of trade, tortious

interference with business or contractual relationships, and

deprivation of constitutional rights.  *Id.* at 376.  The "personal

injury" provision of the insurance policy covered defamation, and

the insured claimed that the underlying complaint alleged an

action for defamation.  *Id.* at 375-76.  The *Naples* court reviewed

the complaint and concluded that the underlying complaint did not

state a claim for defamation.  *Id.* at 376.  *Naples* does not speak

to the issue before this court, namely, whether an allegation

that the *McFarlin* plaintiffs suffered "humiliation" meets the

definition of "personal injury" or if only enumerated torts are

sufficient to trigger coverage under the "personal injury"

provision.

The King plaintiffs cite *Psychiatric Assoc. v. St. Paul Fire

& Marine Ins. Co.,* 647 So.2d 134 (Fla. Dist. Ct. App. 1994), in

support of the proposition that the *McFarlin* plaintiffs'

allegation that they were humiliated by the conduct of the King

plaintiffs is sufficient to trigger coverage under the "personal

injury" provision despite the fact that no independent tort for

humiliating conduct was alleged.  *Psychiatric Associates* was a

declaratory judgment action seeking a determination of whether an

insurer owed a defense to the insured.  *Id.* at 135.  Edward

Siegel ("Siegel"), the plaintiff in the underlying complaint,

alleged the following:

The insured professional association had a contract
with Gulf Coast Treatment Center, Inc. (the Treatment
Center) to provide psychiatric medical care and
administrative services to HSA Gulf Coast Hospital (the
Hospital). The individual insureds were all agents or
employees of the professional association. Siegel
entered into a contract with the Treatment Center to
engage full time in the practice of psychiatry at the
Hospital. The insureds "intentionally and unjustifiably
sought, at medical staff meetings and otherwise, to
interfere with the contractual relationship between"
Siegel and the Treatment Center by attempting to block
Siegel from assuming his position on the staff of the
Hospital; attempting to restrict Siegel's privileges;
making false accusations in an attempt to have Siegel's
privileges suspended; forcing Siegel to leave treatment
team meetings at which his patients were being
discussed; and having the furniture and "therapeutic
tools" removed from Siegel's office. Counts I and II
allege, further, that, as a result of the insureds'
actions, Siegel "suffered mental and emotional anguish,
loss of capacity for the enjoyment of life, expense of
medical care and treatment, loss of earnings, and loss
of the ability to earn money."

*Id.* at 135-36.  Based on the foregoing, Siegel brought claims for

"intentional interference with an advantageous business

relationship," "intentional infliction of emotional distress,"

and three antitrust claims. The "personal injury" insurance

provision provided that:

> *Personal injury* means any of the following acts of
> interference with rights that happen in the course of
> your business while this agreement is in effect:
> - false arrest, wrongful detention, malicious
>   prosecution, humiliation or false imprisonment;
> - libel, slander, defamation of character, or
>   invasion of an individual's right of privacy.

17

*Id.* at 136.  (emphasis in original).  Despite the fact that none of the torts listed in the personal injury provision of the insurance policy were alleged in the underlying complaint, the court held, "we believe that, fairly read and resolving all doubts in favor of the insureds, at least some of the wrongs alleged in Siegel's complaint fall within the 'personal injury' coverage of the policies".  *Id.* at 138.

Similar to *Psychiatric Associates*, the *McFarlin* plaintiffs did not allege one of the torts enumerated in the "personal injury" policy provision.  Just as in *Psychiatric Associates*, the failure to allege one of the torts listed in the "personal injury" provision does not relieve Nationwide of its duty to defend.  Admittedly, the use of the word "offenses" creates an ambiguity in the policies.  However, such ambiguities are resolved against the insurer and in favor of the insured.  *See Adolfo House*, 165 F.Supp.2d at 1336.  Further, adopting Nationwide's reading of the insurance policies would render the "humiliation" language irrelevant or meaningless because no independent tort of humiliation exists in Alabama, which is the applicable law of the underlying tort claims.  Therefore, the court finds that the complaint alleges wrongs that fall within the "personal injury" provision of the umbrella policies.

2. Whether the Acts Complained of Were "Occurrences" Under the

Insurance Policies?

Even though the court finds that the acts complained of fall under the definitions of "bodily injury" in the businessowners and umbrella policies and "personal injury" in the umbrella policies, there would be no coverage if the acts were not "occurrences" as defined by the policies.

### a. Businessowners Policies

In the businessowners policies, an "occurrence" is defined as an "accident." In *State Farm Fire and Cas. Co. v. CTC Dev. Corp.*, 720 So.2d 1072 (Fla. 1998), the Florida Supreme Court held that "when the term 'accident' is undefined in a liability policy, the term includes not only 'accidental events,' but also damages or injuries that are neither expected nor intended from the viewpoint of the insured." *Id.* at 1072.

In *CTC Development,* Gregory Uzdevenes ("Uzdevenes") was a professional architect, and the owner of a construction company named CTC Development Corporation, Inc. ("CTC"). *Id.* Both Uzdevenes and CTC were insured under a policy issued by State Farm Fire and Casualty Company ("State Farm"). *Id.* The damages at issue resulted from Uzdevenes' construction of a home in violation of a restrictive covenant requiring the house to be at least fifteen feet from each side lot line. *Id.* at 1073. Uzdevenes admitted that when he built the house he knew that it was in violation of the restrictive covenant, but he thought he

19

had permission for a variance from the covenant from the
neighborhood homeowners association. *Id*. Neighboring property
owners sued Uzdevenes and CTC for violation of the restrictive
covenant. *Id*.

Uzdevenes' insurance with State Farm covered "property
damage" caused by an "occurrence." *Id*. The policy defined an
"occurrence" as an "accident." *Id*. The insurance policy also
had an exclusion for property damage that was "expected or
intended from the standpoint of the insured." *Id*. The issue
before the Florida Supreme Court was "whether the term 'accident'
in a liability policy, which term is not otherwise defined,
should be defined to include not only 'accidental events,' but
also injuries or damages that are neither expected nor intended
from the standpoint of the insured." *Id.* at 1074. The *CTC
Development* court held that when the term accident is left
undefined in a policy, it encompasses injuries or damage neither
expected nor intended from the standpoint of the insured. *Id*. at
1076.

Nationwide primarily relies on *Barry Univ., Inc. v.
Fireman's Fund Ins. Co. of Wis.*, 845 So.2d 276 (Fla. Dist. Ct.
App. 2003), in support of the proposition that the alleged
actions of the King plaintiffs do not constitute an "occurrence."
In *Barry*, four students formerly enrolled in the Barry University
("University") physical therapy program sued the University. *Id*.

at 277.  The students alleged that in its recruitment materials, the University did not disclose that the school's accreditation status was probationary.  *Id.*  The students further alleged that the University told them that there was no problems with its accreditation status.  *Id.*  Ultimately, the physical therapy school accreditation organization withdrew accreditation for the University's physical therapy school.  *Id.*  The students were forced to transfer to an accredited school, so they could sit for the physical therapy licensing examination.  *Id.*  The students sued the University for breach of contract and fraud in the inducement.[8]  *Id.*  The students sought damages for "mental distress, anxiety disorders, post-traumatic stress disorder and depression...."  *Id.* at 278.  The University called upon its insurer to defend and indemnify it in the action brought by the students.  *Id.* at 277.  The insurance company refused, arguing that the insurance policy did not cover such allegations.  *Id.* The University then sued the insurance company seeking a declaration of its rights under the insurance policy.  *Id.* at 278.

The policy covered "bodily injuries" caused by an "occurrence."  *Id.*  The policy defined "occurrence" as an "accident," and the policy excluded "bodily injuries" that were

---

[8] The students also brought a claim under the Florida Deceptive and Unfair Trade Practices Act.

"expected or intended from the standpoint of the insured...."
*Id.* The Florida Appeals Court found that "the material
allegations involve intentional conduct on the part of the
University which cannot fairly be regarded as an 'accident'
within the meaning of the *CTC Development* case." *Id.* The
Florida Appeals Court makes no other distinction between *Barry*
and *CTC Development*. The *Barry* court, however, does quote
language extensively from the trial court decision. The trial
court made the following distinction between *Barry* and *CTC
Development*:

> The court finds that *CTC Development Corp.* is factually
> distinguishable from the case at bar. In *CTC,*
> the...owner of the company admitted that he constructed
> the house knowing that it violated the applicable
> setback. However, he asserted that he was under the
> mistaken impression that his request for variance had
> been approved. In contrast, in the case at bar, the
> former student plaintiffs have alleged that Barry's
> conduct was intentional, not mistaken.

*Id.* at 278-79.

The court in *Barry* seems to rely on the reasoning of the
trial court in distinguishing *CTC Development*. *See id.* The
*Barry* trial court argued that the acts of the insured in *CTC
Development* were mistaken, while the acts of the insured in *Barry*
were intentional. This distinction is problematic because the
court in *CTC Development* makes clear that the actions of the
insured were intentional. *See CTC Development,* 720 So.2d at
1075-77. The *CTC Development* court found coverage to exist,

because, despite the intentional acts, the damages were neither expected nor intended. *See id.*

A federal court sitting in diversity jurisdiction "must follow the decisions of the state's highest court when that court has addressed the relevant issue." *Technical Coating Applicators, Inc. v. U.S. Fidelity and Guar. Co.*, 157 F.3d 843, 844 (11th Cir. 1998). *CTC Development* has addressed the relevant issue in this case, namely, whether intentional acts by an insured with unintended or unexpected damages or injuries are covered under a policy that only covers "occurrences." The alleged damages from the fraud in this case included mental anguish and humiliation. While the fraud may have been intentional, it is at least arguable whether or not the damages were intended or expected. In such a situation, doubts are to be resolved in favor of the insured. Therefore, the court finds that Nationwide's argument that this was not an "occurrence," does not relieve it of its duty to defend. Whether the damages were unintended or unexpected, is a question of fact for the jury to decide. *CTC Development*, 720 So.2d at 1076.

The court's finding in this regard is further buttressed by the fact that not all allegations in the *McFarlin* complaint were based on intentional conduct. As the King plaintiffs note, the *McFarlin* plaintiffs alleged the following:

> In furtherance of Defendants' plan to take over
> Plaintiffs' customer bases, Defendants made numerous

misrepresentations of material facts and failed to
disclose or concealed material facts from Plaintiffs
which Defendants had a duty to disclose.
...
At the time the Defendants made these representations
or failed to disclose these material facts, Defendants
knew such representations were false, *or made them in
reckless and utter disregard for their truth or falsity*
and Defendants knowingly omitted material facts which
they had a duty to disclose.

*McFarlin* Second Am. Compl. ¶¶ 153, 154. (emphasis supplied).

These allegations are listed under the heading of "Fraud." The

type of fraud alleged is not spelled out in the *McFarlin*

complaint. In Alabama, there are several types of fraud. The

court in *Ellis v. Zuck* defined the scope of fraud in Alabama as

follows:

[L]iability may arise from a willful deception, an
innocent misrepresentation concerning an existing fact,
a reckless misrepresentation made without knowledge of
its falsity, or the suppression of a material fact
rather than an active misstatement. However, it is
clear that before liability for nondisclosure or
suppression of facts will arise there must be special
circumstances which give rise to an obligation to
disclose.
     The critical elements of an action for fraud
generally include:
     (a) a false representation concerning an existing
material fact;
     (b) a representation which (1) the defendant knew
was false when made, or (2) was made recklessly and
without regard to its truth or falsity, or (3) was made
by telling plaintiff that defendant had knowledge that
the representation was true while not having such
knowledge;
     (c) reliance by the plaintiff on the
representation and that he was deceived by it;
     (d) reliance which was justified under the
circumstances;
     (e) damage to the plaintiffs proximately resulting
from his reliance.

*Ellis v. Zuck*, 409 F. Supp. 1151, 1157 (N.D. Ala. 1976).
(internal citations omitted).  As demonstrated by the excerpt
quoted above, in Alabama an action for fraud need not be based on
intentional conduct.  A fair reading of this complaint reveals
that the *McFarlin* plaintiffs have alleged facts based on a theory
of fraud other than intentional fraud.  As this court noted in
its May 27, 2003 memorandum opinion on the motions for summary
judgment in the *McFarlin* action, "a jury could determine that the
defendants' representations and omissions were made with *either*
an intent to deceive or with *reckless disregard* for the
truth...."  Doc. 275 at 73. (emphasis supplied).

### b. Umbrella Policies

In the umbrella policies, an "occurrence" is defined as an
"accident...which results in bodily injury...neither expected nor
intended from the standpoint of the insured," or an "offense
within the definition of personal injury."  For the reasons set
forth above, this court believes that the *McFarlin* complaint
allegations sufficiently allege an "occurrence" to trigger
Nationwide's duty to defend in the underlying action.  Also,
because the court found that the *McFarlin* plaintiffs arguably
alleged a "personal injury" under the umbrella policies, the
*McFarlin* complaint allegations also constitute an "occurrence"
because the definition of "occurrence" includes an "offense
within the definition of personal injury."

3. Whether the Acts Complained of Occurred During the Relevant
Policy Periods?

a. Businessowners Policies

The businessowners policy issued to CMG was in force from
October 20, 1997 through September 9, 1999, and the
businessowners policy issued to Suncoast was in force from March
29, 1996 through November 15, 2000. Nationwide argues that the
alleged actions of the King plaintiffs began prior to the
effective dates of the policies. In the second amended
complaint, the *McFarlin* plaintiffs allege that the conspiracy
began "[a]t some point in time after 1991...." *McFarlin* Second
Am. Compl. ¶ 38. The King plaintiffs counter that, while the
alleged fraud and conspiracy began prior to the effective dates
of the policies, the injuries that resulted from the alleged
actions did not occur until during the effective dates. The King
plaintiffs rely on the following language in the second amended
complaint:

> Plaintiffs had no knowledge regarding Defendants'
> tortious scheme and could not have discovered that
> Defendants' representations were false or that
> Defendants had concealed material facts...until some
> time shortly before the filing of this complaint.

*McFarlin* Second Am. Compl. ¶ 151. The lawsuit was filed on
August 31, 1999. Therefore, according to the King plaintiffs,
the "bodily injury" alleged in the complaint could not have

26

occurred until shortly before the lawsuit, thus putting the
injuries within the effective dates of both of the policies.[9]

Nationwide's reading of the policies is contrary to the
clear language of the businessowners policies.  The policies
cover "bodily injuries" that occur *during the policy period*."
(emphasis supplied).  Nationwide looks to when the "tortious
scheme" first began, but the policy language indicates that the
relevant time period to look to is when the "bodily injuries"
occurred.  The alleged mental anguish could not have occurred
until the *McFarlin* plaintiffs knew about the alleged fraud.  The
complaint indicates that they did not discover the King
plaintiffs' "tortious scheme" until shortly before the filing of
the lawsuit.  This puts the time of the "bodily injury" squarely
within the effective dates of the businessowners policies.

Nationwide's reading of the policies is also contrary to
Florida law.  When determining the time of an occurrence,
"Florida courts follow the general rule that the time of
occurrence within the meaning of an indemnity policy is the time
at which the plaintiff's injury first manifests."  *Am. Motorists
Ins. Co. v. S. Sec. Life Ins. Co.*, 80 F.Supp.2d 1280, 1284 (M.D.
Ala. 2000) (applying Florida law); *Travelers Ins. Co. v. C.J.*

---

[9] The alleged "personal injuries" are not discussed in this
section because of the earlier discussion where the court found
that the *McFarlin* plaintiffs did not allege anything that would
fall under the businessowners policies' definition of "personal
injury."

*Gayfer's and Co., Inc.,* 366 So.2d 1199, 1202 (Fla. Dist. Ct. App. 1979) ("'occurrence' is commonly understood to mean the event in which negligence manifests itself in... bodily injury...."). Applying this rule to the instant case, the alleged injuries manifested shortly before the filing of the lawsuit, thus putting the injuries within the policies' effective dates.

Nationwide relies on *Gulf Ins. Co. v. Dolan, Fertig, and Curtis*, 433 So.2d 512 (Fla. 1983), and *U.S. Fire Ins. Co. v. Fleekop,* 682 So.2d 620 (Fla. Dist. Ct. App. 1996). These cases explain that an "occurrence policy is a policy in which the coverage is effective if the negligent act or omission occurs within the policy period, regardless of the date of discovery or the date the claim is made or asserted." *Dolan,* 433 So.2d at 514; *Fleekop,* 682 So.2d at 622. This quote, when read on its own, seems to support Nationwide's argument. However, when read in the context of the cited opinions, the quote does not apply to the instant case. In *Dolan* and in *Fleekop,* the courts were simply comparing so-called "occurrence policies" and "claims-made" policies. *Dolan,* 433 So.2d at 514; *Fleekop,* 682 So.2d at 622. In a "claims-made" policy, a negligent or omitted act is covered if the act is discovered and brought to the attention of the insurer during the policy period, regardless of when the act took place. *Dolan,* 433 So.2d at 514; *Fleekop,* 682 So.2d at 622. The date of discovery mentioned in the quotation above refers to

28

the date of discovery by the insured, not the alleged victim.
The courts in *Dolan* and *Fleekop* are saying that in an "occurrence
policy" it does not matter when the date of discovery by the
insured is, so long as the "occurrence" happened within the
policy period, but in a "claims-made" policy, the discovery date
and notice to the insurer determines whether coverage exists.
The use of the term "negligent or omitted act" rather than
"occurrence" does create some confusion.  However, when the cases
are read in context, it is clear that the *Dolan* and *Fleekop*
courts do not speak to the issue before this court, namely, how
to determine when the "occurrence" happens.  *American Motorists*
and *C.J. Gayfer's* speak to the issue, and these cases say that
the time of an "occurrence" is "the time at which the plaintiff's
injury first manifests."  *Am. Motorists,* 80 F.Supp.2d at 1284;
*C.J. Gayfer's*, 366 So.2d at 1202.  This court holds that, based
on the language of the policy and on Florida law, the *McFarlin*
complaint sufficiently alleged "bodily injuries" within the
effective dates of the businessowners policies, which, in turn,
obligates Nationwide to defend the King plaintiffs in the
underlying suit.

### b. Umbrella Policies

The umbrella policy issued to CMG was in force from October
20, 1997 through September 9, 1999, and the umbrella policy
issued to Suncoast was in force from March 29, 1996 through

November 15, 2000.  The umbrella policies, as the businessowners
policies, only cover an "occurrence" that happens during the
policy period.  Unlike the businessowners policies, the umbrella
policies cover both the "bodily injuries" and the "personal
injuries" alleged in the instant case.  Both the alleged mental
anguish and the alleged humiliation would have occurred during
the relevant effective dates of the umbrella policies.
Therefore, Nationwide must defend the King plaintiffs in the
underlying suit.


### E. Estoppel

The King plaintiffs argue that Nationwide is estopped from
denying coverage based on § 627.426 of the Florida Code.  Section
627.426 provides in pertinent part:

> (2) A liability insurer shall not be permitted to deny
> coverage based on a particular coverage defense unless:
>> (a) Within 30 days after the liability insurer
>> knew or should have known of the coverage defense,
>> written notice of reservation of rights to assert
>> a coverage defense is given to the named insured
>> by registered or certified mail...or by hand
>> delivery; and
>> (b) Within 60 days of compliance with paragraph
>> (a) or receipt of a summons and complaint naming
>> the insured as a defendant, whichever is later,
>> but in no case later than 30 days before trial,
>> the insurer:
>>> 1. Gives written notice to the named insured
>>> by registered or certified mail of its
>>> refusal to defend the insured;
>>> 2. Obtains from the insured a nonwaiver
>>> agreement...; or
>>> 3. Retains independent counsel which is
>>> mutually agreeable to the parties.

The King plaintiffs argue that Nationwide did not inform them of its denial of coverage within thirty days of knowing of Nationwide's "coverage defenses," as required by § 627.426(2)(a). The issue before the court is whether Nationwide's reasons for denying coverage in this case amount to "coverage defenses" within the meaning of the statute.

The Florida Supreme Court has spoken directly to the issue. In *AIU Ins. Co. v. Block Marina Inv., Inc.*, 544 So.2d 998 (Fla. 1989), the Florida Supreme Court held:

> the term "coverage defense," as used in section 627.426(2), means a defense to coverage that otherwise exists.  We do not construe the term to include a disclaimer of liability based on a complete lack of coverage for the loss sustained.  Under this construction, for example, if the insurer fails to comply with the requirements of the statute, it may not declare a forfeiture of coverage which otherwise exists based on a breach of a condition of the policy. However, its failure to comply with the requirements of the statute will not bar an insurer from disclaiming liability where...the coverage sought is expressly excluded or otherwise unavailable under the policy or under existing law.

*Block Marina,* 544 So.2d at 1000.  Nationwide has asserted a complete lack of coverage in this case.  Therefore, based on the holding in *Block Marina,* the statute is not applicable.  This court holds that Nationwide is not estopped from denying coverage, but, based on the court's prior analysis, it does have a duty to defend the King plaintiffs in the underlying suit.

31

### III. Conclusion

By separate order, the court will grant the King plaintiffs'
motion for partial summary judgment insofar as it applies to
Nationwide's duty to defend, and will deny Nationwide's motion
for partial summary judgment.  The court will also deny the King
plaintiffs' motion for entry of a default judgment against
Nationwide.

DONE this _____ day of February, 2004.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE